On to the fourth case of the day, Sherlyn Brown v. Milwaukee Public Schools, Clause 16-1971. Go ahead, Counsel. Thank you. Good morning, Your Honors, and may it please the Court. My name is James Walczewski, and I represent the plaintiff appellant, Sherlyn Brown. Four years, three months, and 22 days. That's how long the Milwaukee Board of School Directors, or MPS, had to put Sherlyn Brown back to work. It had more than four years to reinstate her into her assistant principal position, the essential functions of which her doctor directly told MPS she could, quote, easily do. It had more than four years to transfer her into one job for which she was at least minimally qualified. And during those four years, MPS filled an average of 13 administrative-level positions per month. How many of those was she actually interested in? She repeatedly said she wasn't interested in a demotion. In a demotion. However, there actually was one position that she did actually express an interest in that would have represented a demotion. So the 13 a month really doesn't, is not really very relevant here. Well, it's relevant only in the fact that there obviously were a lot of vacancies that were being filled. What's relevant are vacancies for which she would have been qualified and interested, correct? Correct. There's approximately seven positions that she, we argue, she was qualified for. Okay. Your Honors, what's become the central issue of this case is whether physically restraining students or working in the vicinity of potential students is an essential function of Ms. Brown's assistant principal position or any other position for which she was at least minimally qualified. We believe, and the record shows, that neither is an essential function. Essential functions are the fundamental job duties of a position. Regulations state that a function can be essential if, one, the position exists for the purpose of performing that function. Two, there are a limited number of employees who can perform that function. Or three, the function is highly specialized. Here, the district court erred by subjectively and unilaterally determining that physically restraining students is an essential function of Ms. Brown's assistant principal position and other positions for which she was at least minimally qualified. However, there are no facts in the record even suggesting, and in fact, in summary judgment, MPS did not even argue, that physically restraining students was a function, let alone an essential function, of Ms. Brown's assistant principal position or any of the other positions for which she was at least minimally qualified. In fact, evidence in the record shows the exact opposite is true. That evidence shows that in the 21 years MPS employed Ms. Brown, she was involved in a student incident once. That evidence shows that as of December 2006, as reaffirmed as recently as July of 2010, MPS did not expect Ms. Brown to, quote, break up fights or physically intervene with students and explicitly told her to, quote, retreat from individuals who were acting in a physically confrontational manner. I had understood, counsel, that the bigger problem here was the July 28, 2010, order that she not be in the vicinity of potentially unruly students. And I know there was some ambiguity about that standard earlier, but that's pretty clear from Dr. Smith, at least from July 2010 going forward until 2014, right? Not necessarily, Your Honor. There are some conflicts in the record. Show me. Sure. Two months earlier was- Not earlier. Later. Okay. After the July 28, 2010 instruction. Sure. Within days, actually, of MPS sending Ms. Brown home from her assistant principal position, she actually attempted to engage MPS in a dialogue with her doctor to clarify her restrictions. However, MPS refused. In September of 2010, her representative told MPS that it's believed that she could not be around students and staff. It was an error. Her doctor in March of 2010- And that was the lawyer who didn't have access to the doctor's instructions, correct? I'm not aware of what he did or not. Well, that was Gordon's response. I'll send you the doctor's. We've got doctor's instructions. You're wrong. Show me you've got- In essence, show me where the doctor is wrong, and we'll talk about this. I'm looking for evidence that Dr. Smith backed off in those four years from the not being in the vicinity of potentially unruly students. Sure. The next occasion would have been in March of 2011 when he again clarified what he meant, and he said that she just can't be in a position where she'd have to subdue a student. And then you mentioned earlier- In March of 2011, he says the restriction remains in place, right? Well, he clarifies, though, Your Honor. I mean, that's the problem in this case is he clarifies on numerous occasions what exactly was meant by his restrictions. The problem is that even though he's doing that and that would conflict with MPS's apparent belief as to what she was restricted from doing, MPS never engaged in any sort of interactive process to determine whether or not its belief was an error, despite being presented with conflicting information on numerous occasions. I'm looking, okay, March 2011, Dr. Smith responds to the questionnaire, the restriction from 7-28-10 remains in place, right? Correct. There are numerous restrictions in that document, Your Honor. Sure. And the record shows he clarified time and time again what exactly he meant. MPS cannot, as a matter of practice, simply lift words off of the page that would conflict with other statements from the doctor. Show me the other statements where the doctor backed off of that. It was in March of 2011, and again, as Your Honor referenced earlier, August of 2014. I'm looking at the document from March 2011. By 2014, the suit's already in file, right? Correct. Okay. So March 2011, let's see. You told us in 7-28-10 that Ms. Brown should not be in the vicinity of potentially unruly students. This restriction would be permanent unless Ms. Brown has a remarkably good re-operation of her left knee and undergoes total knee replacement of the right knee. Please clarify whether you are lifting this restriction regarding unruly students. Please also clarify what you mean by avoid student discipline situations. Ms. Brown does not believe that she should be in the vicinity of unruly students. His response, the restriction from 7-28-10 remains in place. Where's the factual dispute that says that she can be in the vicinity of potentially unruly students? I guess the only time that is absolutely 100 percent clear is if we get to August of 2014 when she's still an employee of MPS, and at that point he says, quote, I see no reason she could not be around students. But again, he clarifies, as he always has, she just cannot be in a position where she has to control those students. That's the problem here, Your Honor, is that, again, the information he received over the course of this case would conflict with the idea that, and I know you disagree, conflicted the idea that she cannot work in the vicinity of potentially unruly students. Again, even though this was before. So if we look at what the injury was that led to, I guess, these restrictions even coming into place. The injury occurred in 2009. The first restriction that came out from the doctor after that injury was the one two months earlier I was referencing from May of 2010, where he explicitly told MPS, quote, incidental contact should not be a problem. In December of 2009, he's saying no student intervention. No student interaction in January. In April, return to sedentary work with no student interaction. In May, I'll grant you, he waffles a little bit. But by the end of July, it's not in the vicinity of potentially unruly students, which I think we'd all agree describes all students, right? Hypothetically, it could describe any person. Right. Anyone can become unruly at any point. Yeah. And that's what the doctor is saying, and the employer has an obligation to respect the doctor's instructions, correct? That's correct. But here, it doesn't affect your qualifications for the positions that we're talking about. Okay. Well, how about assistant principal? Well, because it's not an essential function. The job has to be carried out in an environment with potentially unruly students, right? Right. But MPS did not expect her to physically intervene with students. So let's play out the hypothetical. So if she's around students and they become unruly, she's already been told, we don't expect you to physically intervene with them. In fact, MPS told her to retreat from them. So if she can't, she's not restricted from being around students generally. That's what the doctor said, though, right? Potentially unruly students. Yes. That may have been an exaggeration. Maybe he was going too far. But that's really between him and the plaintiff, isn't it? Because the employer has to respect those. Right. And what I'm saying is if there is conflicting information, if Ms. Brown, in this case, as she did, attempts to clarify what her restrictions are with MPS, MPS shouldn't simply bury its head in the sand. If it's told that they're- Okay. What communication are you pointing to? It was within days. I believe it was August 4th of 2010. She emailed Gordon, asking him for dates and times that he was available, and said she could coordinate a dialogue between him and her doctor to clarify her restrictions. He responded something to the effect of, I don't have any questions, and it ended there. And, again, I know it was the attorney, and that's fine. But in September of 2010, again, MPS is told that you're wrong about this. And in March of 2011, it says she just can't be having to subdue students. And then we fast forward to 2014, and the doctor says that she can easily do the essential functions of the assistant principal position, and says, I see no reason she could not be around students. It can't just ignore that. But that's exactly what it did, and that's the problem. It can't just put its head in the sand and not engage Ms. Brown and or the doctor in terms of getting a better understanding of what it is. Despite having that knowledge, in August 2014, when she's still employed there, it refused to reinstate her to her assistant principal position. I thought she was working for a private school at that time. In August 2014? When was she working for the private school? That was January of 2013, I believe, until August 2. So when? 2014? 2014. So November of 2014 is when she's fired. So she's on medical leave from Milwaukee Public Schools, but she's working for a year and a half for a private school during that time, right? Right, because she had expressed an interest and even applied for multiple vacant positions and was merely denied all of them. And so she went outside the district. However, their relationship continued, because after her assignment ended at the other school, MPS reached out and said, we need you to come back to your position or resign. And she immediately expressed an interest to come back, and the doctor provided the information I mentioned earlier. It then had an obligation, again, to reinstate her to her assistant principal position, now that it even, on paper, knows, quote, she can easily do the essential functions, or to transfer her to another position. Again, there were vacant positions available at that point for which she was at least minimally qualified. But instead, MPS continued to adhere to the notion that she couldn't. Counsel, could you be specific about transfers? On the Title I coordinator position, I believe it's undisputed that that was grade 12A and she was grade 10A, right? Correct. So that would be a promotion, correct? Well, we disagree there's a promotion. There are facts in the record that would say that. Which are? Yeah. So there was a, what I guess would be considered, if we're looking just at pay grade, a promotion back in 2007. She was promoted from a 10 to an 11. However, MPS actually said there was a lateral move, considered a lateral move and not a promotion. So pay grade itself is not indicative, as the record shows, of a promotion in this case. Anything else that would let us say the Title I coordinator would not be a promotion? It would just be actually the dearth of information in the record in terms of there was no information indicating that it was a promotion or could be considered a promotion. Ms. Brown did not consider it a promotion. Promotion never came up as an issue until after this case was filed. And how about the GE grant coordinator position? That was explicitly a transfer opportunity for any current administrator, including Ms. Brown. But that can't be right, right? It can't have been not even potentially a promotion for anybody, right? I'm just telling you what it said in bold on both the job description and on the job posting. Any other indication that that was not a transfer? It seems like a remarkably critical position for a public school system. There's no evidence in the record actually pointing to that, except for MPS simply just saying it was a promotion and it was important. There are no other facts in the record that would demonstrate that. And all that we actually have in the record is the statement in bold that it's a transfer opportunity for any current administrator and that your salary would remain the same. I wanted to ask just a question about this school. Is there something in particular about this school? Does it have disruptive people in it? Is it a hard school to deal with? Schools differ so much from one place to another, and there are some places, some schools, that would be very common to encounter disruptive students. Others, I suppose, you don't have any. Sure. What's the issue with this school? There was no issue with this school in general. It was simply a blanket statement that was applied to the entirety of MPS, every single school, every single assistant principal position, every single position that Ms. Brown expressed an interest in and or applied for, every single time she was shot down because they said, you can't be in the vicinity of potentially rude students. Your Honor, as I say, I'm meeting into my rebuttal time, so I'm going to reserve the remainder. Thank you, Counsel. Ms. Ewan? Good morning. May it please the Court. My name is Jenny Yen. I'm an assistant city attorney with the City of Milwaukee, and I represent the defendant appellee in this case, Milwaukee Board of School Directors, otherwise known as Milwaukee Public Schools, who I'll refer to as MPS. Your Honor, I — Don't touch those. Those are being used to record. The one in the middle is the one that is being used for the internal amplification. You can lower it, the whole thing. You can lower the whole thing. Punch it out. There you go. Thank you. Okay. But it will keep going. You're going to disappear. Thank you. I think — The trap door button is here. I think that the record shows that there's no dispute between July 28, 2010, and August 29, 2014, that Ms. Brown was certainly restricted from her ability to perform any of the essential functions of her job as an assistant principal. After that July 28, 2010 medical note came in, and I hope the Court also noted with that note, the doctor was specifically asking that Ms. Brown be moved from her assistant principal position, asking if there was — certainly there was some other job maybe that MPS could find, which wouldn't require the movement, the standing requirements that an assistant principal had. After that, there was the February 4, 2011 note that came in from her doctor, still saying no student discipline issues, and again restricting her to 15 minutes of either standing or walking in terms of restrictions, and stating that she needed to have elevator access wherever she was. Now, Mr. Gordon, the ADA coordinator basically for MPS, responded with a questionnaire and got the response March 16, 2011. And in that questionnaire, as this Court has already pointed out, was very clear where Mr. Gordon's trying to understand what does the doctor mean by no student discipline issues. Can she be around students? Mr. Gordon quoted the July 28, 2010 restrictions just to make sure those were still in place, and the doctor agreed. And that was the March 16, 2011 restrictions. Those are the last restrictions that were presented to MPS from Ms. Brown's position until August 29, 2014. Ms. Yuen, could I ask you whether the Milwaukee Public Schools is taking the position that a person who needs a wheelchair or scooter for mobility is able or unable to work as a principal or assistant principal, or for that matter, a classroom teacher? Certainly, Your Honor. I think that the record shows that MPS believes if, for example, Ms. Brown needed a scooter for mobility issues, could still perform her job as an assistant principal. In fact, Mr. Gordon was in the process of having the district purchase Ms. Brown a scooter in the days leading up to the July 28, 2010 restrictions that came in. That had been a discussion for, I think, several years, suggested by Mr. Gordon to Ms. Brown that they may help. Because originally in 2006, when the accommodations began, it was really coming in as mobility issues for Ms. Brown due to having to walk stairs in the school that she was in. And so there was a lot of discussion about how to address that. But Ms. Brown didn't purchase that on her own, and I think Mr. Gordon, in attempting to keep her in her job as an assistant principal, was looking into purchasing the scooter. But to be clear, the schools don't take the position that a person in a wheelchair or scooter is prohibited from working with children? Certainly. That's correct, Your Honor. Yes, the MPS is not taking the position that if you're in a wheelchair, you can't work with students or children. Here, it seems to me, it was the vicinity issue that's most restrictive. But I'm troubled by the fact that the district judge seemed to believe that the ability to physically restrain unruly students was an essential function for an assistant principal, which might well pose problems for somebody in a wheelchair or scooter. And the logic of that analysis would seem to point towards a much broader kind of restriction on people with mobility limitations in the school system. I understand, Your Honor. Well, I want to be clear, MPS is not taking the position that if you're in a wheelchair, that you can't be an assistant principal or be a teacher. However, in terms of, you know, I think your point leads to the August 29, 2014 restrictions, where Ms. Brown's doctor does come in with restrictions. You know, in that note, he's describing her concern of having to ever be in a position where she may potentially, or there's a question where she has to physically intervene with a student. If there's a situation where that requires that intervention, she was concerned about that. And so the doctor stated that she could be around students, but just shouldn't be responsible for monitoring or controlling students where there may be a question that they may become uncontrollable. And the doctor suggested accommodation for that was that MPS could have a security guard present to take care of those situations, which I'm assuming the doctor meant situations where Ms. Brown is handling discipline situations. And that's problematic here because what's been demonstrated from the October 2009 incident between Ms. Brown and that second grader is that even while she's still required to handle student discipline issues, which she's always been required to do, that is unquestionably an essential function. She admits in her own deposition testimony, it's clear even just from what happened in October 2009, that in handling student discipline issues, you never know when a student may become uncontrollable. And where it may be for the student's safety or for the assistant principal's safety, there may need to be some physical control of that student, and that's what had to happen. And when that came in, the August 2009-2014 restrictions, MPS analyzed that, but determined she still would not be able to perform her duties because she would not be excused from handling student discipline issues. Just because a student is brought to her office, it's been demonstrated, so it can't be questioned, she can still be injured. She may still have to intervene. So MPS's position is that she was not qualified to be able to perform the job of assistant principal, even with the August 2009-2014 restrictions. The other point I want to make is that Ms. Brown has the burden to produce evidence that she was entitled to be transferred into a vacant position for which she was qualified. The GE position and the Title I, unless you have questions about that, I think the record shows that those are clearly promotions. Well, I do have a question about the GE grant coordinator position. What exact evidence do we have in the record on this? Do we have an affidavit or testimony from somebody for the school system about that? For the GE position? Yes. Yes, Jim Gordon does. There's an affidavit from him in there. There's descriptions. Would you like me to point you to that? Please. Okay. Your Honors, I will refer you first to my supplemental appendix. So MPS's supplemental appendix, page 85, and that's Exhibit 41 to Mr. Gordon's affidavit, which attaches an email description from the GE liaison that described for Mr. Gordon what the duties would be for someone in the GE position. That one requires some travel, something much broader than the school, doesn't it? That's correct. In the GE position, at the time, that was April 2011 when that position was being interviewed for and when Ms. Brown expressed interest in that position. Her restrictions at that time were from the February 2011, where she was restricted for standing and walking 15 minutes at most an hour. And this position was not sedentary. It required travel, meeting with individuals, and I think it was only maybe 50 percent maybe in the office. But other than that, she's going to be on her feet, and there was going to be the mobility issues were quite a concern. She's also dealing with some high finances, I recall. That's right. It was a $20 million grant provided by GE, which, you know, it was very highly important to the school district, the successful implementation of this grant. The person in this position was going to be monitoring that amount of money, you know, looking district-wide how to improve math and sciences for the students and just working at a level that is far and beyond and opening up other opportunities that we would argue for Ms. Brown that wouldn't have been available to her just from her assistant principal position, so clearly a promotion. On that point, though, the problem is this is summary judgment, and let me look at it from the plaintiff's standpoint. It's advertised as a transfer opportunity for anybody, right? I know you say it's a promotion for anybody, but it's advertised as a transfer for anybody. I don't think we have information about grade or pay, do we, in the record? And we do have a finding that she meets the minimal qualifications for the job. We do have evidence in the record that the person that ended up getting the job ended up earning more money than Ms. Brown. It's $84,000 roughly, or her approximate salary was $84,000. So it's transfer for whoever's transferring in, and that really goes to the heart of the grant money is to distribute the money to improve matters for the school district, not to go to paying somebody a lot more money to administer this money. It was advertised as a transfer opportunity in terms of your salary is going to stay the same, but it's important to look at what the duties are for that position to determine, really, is this a promotion? Is this a better job for her, or is it really a lateral move?  On that point, though, she would have received approximately $14,000, a little over $14,000 more in pay had she gotten the job simply for going from a 10-month-a-year job as an assistant principal to then working 12 months in this position. But I brought that up, but I didn't focus on that because I do think it's very important to look at the qualifications required and what the duties are and the opportunities that would be opened up for Ms. Brown once she's held this position. What about the opening lateral? Was there competition for those? No. The two positions that Ms. Brown was required to compete for was the GE position and the Title I coordinator position, both of which MPS contests are promotions from the record. The other positions, there were two other positions that were discussed in the briefing. After the August 29, 2014 restrictions came in, MPS then performed another job search to see if there were any open positions lateral to the assistant principal position that met Ms. Brown's qualifications. There were two positions there. She wasn't required to compete for them, but that's because MPS determined she wasn't medically able to perform those positions, and that was the charter school program position and then also the student services position. Did she apply for those? I do not believe she did. Did that matter? Well, I mean, I think from MPS's perspective, we looked, we identified these two positions or it identified these two positions and determined she wasn't qualified. If she was qualified, it wouldn't have mattered in that sense because then MPS would have offered it to her. Your Honors, if you don't have any other questions, I think I've hit all my points. Thank you. Thank you very much. Thank you, Counsel. Rebuttal, Mr. Walczewski. Your Honors, very quickly, I think the most important thing was stated right at the end of MPS's argument there, that it determined that she was not medically qualified for those positions, and that, again, is the heart of the issue of this case. There is no interactive process with respect to any of these positions. MPS simply and unilaterally determined without ever talking to Ms. Brown or without speaking to Ms. Brown's doctor, whether or not she was actually qualified for any of these positions with or without accommodation. Just a couple of other points real quickly, Your Honors. There's no evidence in the record that, if we put aside the assistant principal position, which we know had to be in a school every day, that any of the other positions at issue in this case had working in the vicinity of potential students as an essential function. Arguably, and I argued this in the briefs, that is not even an essential function. That's a description of a work environment. Which is different than an essential function. I don't see how that helps you, drawing that distinction. The point is, Your Honor, that with respect to the other positions, there's no evidence that she would have to work in the vicinity of potential and early students. Further, she's not restricted from being around students or entering schools or being present at a school. However, that is exactly how MPS interpreted her restrictions, stating that even if she walked into a school, she could be at danger of being injured once again. Thank you, Counsel. Case is taken under advisement.